MAMIE PROSSER, ADMINISTRATRIX, PLAINTIFF IN ERROR, v. WEST JERSEY AND SEASHORE RAILROAD COMPANY, DEFENDANT IN ERROR.

Submitted July 8, 1907—Decided November 27, 1907.

A gang of men engaged in pile-driving had rigged a derrick on a platform car belonging to the defending company. During an intermission in their work they had run the car in upon a siding of the railroad company to remain there until they were ready to start for a new point. One of the gang got under the car to back out a bolt and another car was driven against the platform car and moved it and killed the plaintiff's intestate. *Held,* that in the absence of any signal to warn the servants of the defendant that anyone was working on or under the car, and of any other proof that the servants of the defendant should have known of that fact, there was no duty resting upon the defendant to avoid a collision with the platform car.

On error to the Supreme Court.

For the plaintiff below and plaintiff in error, *John W. Wescott, Harry C. Kramer, Bleakly & Stockwell.*

For the defendant below and defendant in error, *Gaskill & Gaskill.*

The opinion of the court was delivered by

REED, J. This writ of error brings up a judgment of non-suit in an action brought by the plaintiff below, as administratrix for her husband, to recover damages arising from the death of her husband, which death she insists resulted from the negligent conduct of the servants of the defending railroad company.

Prosser, the plaintiff's intestate, was employed by Henhoeffer & Vaughn, who are pile-drivers and bridge and wharf-builders. The gang of men of which Mr. Prosser was one had, on the day of the accident, been working for the defendant at Springdale, on the Medford branch of the defendant's railroad. Their equipment included a cabin car, used for lodging and feeding the workmen, and a flat platform car, on which was erected a pile-driver. The cabin car belonged to Henhoeffer & Vaughn, their employers. The flat car belonged to the West Jersey and Seashore Railroad Company, the defendant. About the middle of the afternoon of the day on which the accident occurred, the workmen, finishing their labor at Springdale, took down the pile-driver from its erect position on the car and ran the cars up to Haddonfield, and were put on a siding of the Medford branch of the defending railroad company. They were to remain there until ready to go to their next point of employment, which was a nearby place on Cooper's creek. While the flat car was standing on the siding, Prosser got beneath it to back out a bolt which had become fastened, and which was used to secure the pile-driver when in position for work.

At this time the situation was this: The cabin car stood nearest the south end of the siding. The flat car under which Prosser was working was fifteen or twenty feet from it to the north. About twenty or thirty feet distant from the platform were standing two or more box cars. While Mr. Prosser was under the flat car some car or cars seem to have been backed onto the siding from the north. They struck the two box cars, which in turn were propelled against the flat car, moving it, and thereby killing Mr. Prosser.

When the record of the former trial of this cause was before the Supreme Court on a rule to show cause why a new trial should not be granted, it displayed the same facts as those just stated.

In speaking of the duty which the railroad company owed the employes of Henhoeffer & Vaughn, the Chief Justice observed: "That work [of bridge repairing] had temporarily ceased at the time of the accident, and the car had been laid off on a siding. While it lay there it needed no attention from Henhoeffer & Vaughn's employes, so far as the railroad company or its employes knew, and there was nothing in its surroundings to suggest to the defending company's employes who were operating its freight train that any carelessness upon their part in running against the flat car might jeopardize the safety of a member of the bridge repair gang. The duty of using care to avoid injuring Prosser while coupling onto the side track freight cars could only be imposed upon the train crew by bringing to their attention the danger to which he would have been exposed, unless care was used by them in the performance of their work." 43 *Vroom* 342, 344.

These remarks exhibited the legal aspect of the then situation accurately.

The sole question arising upon the present record is whether the testimony presented in the present trial was such that from it the jury could have reasonably concluded that the servants of the defending company knew or ought to have known that any collision with the flat car would be likely to injure some of the repair gang.

It is insisted, in the first place, that the servants of the defendant should have seen that men were working on or about the flat car, although no signal was displayed indicative of that fact. The only testimony having an appearance of substantiality presented in support of this insistence is that Mr. Henhoeffer, while standing near or seated under a tank located between the main track and the siding of the Medford branch, talked with a brakeman standing on the rear platform of a train which stood on the main track. There was absolutely nothing to show that the attention of this brakeman was or reasonably would be directed to the car on the siding, or if so, there is nothing to show that this train backed onto the siding and produced the fatal accident.

It is insisted also that there was testimony respecting the use of a red flag, from which testimony the jury could have reasonably inferred that there was a signal displayed indicating that the flat car was in use by the repair gang. Mr. Henhoeffer says that he left the gang when they were at work getting out the bolt and went over to the tank already mentioned, located between the siding and the main track, and remained there, near or under the tank, until the accident occurred. He was asked and answered the following questions:

"*Q.* Was any flag put out when you were on the siding?

"*A.* I don't know.

"*Q.* You did not see any?

"*A.* No.

"*Q.* You did not give any orders for any to be put out?

"*A.* No, sir; that is generally the foreman's place.

"*Q.* After the accident did you see a flag anywhere?

"*A.* I saw one lying on the ground alongside; that is a faint recollection; now, I wouldn't be qualified and be positive of it, but it seems to me it laid on the ground alongside of the cars."

Powell, the foreman, whose place it was, as Mr. Henhoeffer says, generally to give orders about putting out a flag, says nothing about giving such an order, but impliedly admits that

he gave no such order.  He afterward says that he gave young Henhoeffer a pocket flag, which was the one found near the tank; that five or ten minutes before the accident he saw a man up the track with a flag.  This man, he says, was not one of the gang, but a son of Henhoeffer, who came down once in awhile through the day.  He further says he saw this man go up with the flag, but does not know how far he went.

He further says he saw no flag up toward Haddonfield, but saw a flag lying alongside the water tank after the accident.

Webb, another witness, says he saw a man with a red flag going up toward the station.

This son of Mr. Henhoeffer, who is said to have had the flag, was not called as a witness, nor was any reason exhibited why he was not called.  So the entire testimony is that young Mr. Henhoeffer took a pocket flag and went up toward the station, and that this flag was found after the accident near the pumphouse or water tank, which, as already remarked, was situated between the branch track and the main track of this railroad.  There is no testimony to show that this flag was displayed, or that it was put into any position where, if seen, it would have reasonably warned the defendant's servants that a collision with the flat car would endanger the repair gang.

The judgment of nonsuit should be affirmed.

*For affirmance*—MAGIE, CHANCELLOR, THE CHIEF JUSTICE, GARRISON, HENDRICKSON, PITNEY, SWAYZE, REED, TRENCHARD, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J.   14.

*For reversal*—None.